THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VINCENT R. LIPSCOMB, Defendant-Appellant.

Fourth District   No. 4—90—0385

Opinion filed June 28, 1991.

414

416

Alan Brunell, of Chicago, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Beth McGann, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LUND delivered the opinion of the court:

On February 16, 1990, defendant Vincent Lipscomb was found guilty by a jury sitting in the circuit court of Champaign County of committing two acts of aggravated criminal sexual assault. (Ill. Rev. Stat. 1989, ch. 38, par. 12—14.) He was subsequently sentenced to consecutive 12-year prison terms, with said sentences to be served consecutively to another seven-year sentence on an unrelated matter. Defendant now appeals.

I. FACTS

On February 23, 1989, defendant was indicted on four counts of aggravated criminal sexual assault. (Ill. Rev. Stat. 1989, ch. 38, par. 12—14.) Counts I and II alleged that on August 26, 1988, defendant committed forcible acts of vaginal and oral penetration, using his penis on V.V. Counts III and IV involve another time and another victim, K.R., and, having been severed from this case, are no longer involved in the current controversy.

The discovery filed by the State establishes that on September 26, 1988, the State received a search warrant allowing it to seek samples of defendant's hair, saliva, and blood. On March 31, 1989, defendant filed a motion seeking to quash this warrant or, in the alternative, to have a *Franks* hearing. (See *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674.) The court denied defendant's motion in both regards.

. Defendant also filed a motion requesting a pretrial hearing pursuant to *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, to determine the scientific reliability and the admissibility of the DNA fingerprinting or identification process. DNA fingerprinting is the procedure for the forensic use of DNA technology to determine the likelihood of a sample of blood, tissue, or sperm coming from a given person. As will be seen later, in this case the evidence is the primary

evidence used to establish defendant's guilt. The court granted the motion and a hearing commenced on October 9, 1989.

## A. *FRYE* HEARING

Dr. Michael Baird testified that he is a geneticist employed by Lifecodes Corporation, a for-profit corporation created to refine DNA testing for a variety of purposes. They performed DNA testing for forensic purposes as well as for detection of different diseases such as leukemia and other genetic diseases. His responsibility is to oversee the testing done in the forensic and paternity areas of the company. He was qualified as an expert in the field of genetics. In his opinion, DNA fingerprinting falls in the field of genetics, population genetics, molecular biology, and forensic science.

Dr. Baird explained that DNA stands for the chemical deoxyribonucleic acid and is the genetic material which is found in each person. There are approximately three billion base pairs of DNA in every cell in each human being. The combinations of these are different for every individual, with the exception of identical twins. The DNA is joined together like a long, twisting ladder. The procedure used for DNA testing involves breaking the ladder into fragments, ordering the fragments by size, looking for specific fragments, and then comparing the location of the fragments from the forensic sample with those from the blood sample. The methodology used for DNA testing is restriction fragment length polymorphism (RFLP) analysis, which was first developed in 1978.

Lifecodes' procedures involve six steps. First, DNA must be isolated from the forensic sample, which is the semen, blood, or tissue, or from the known blood samples. Next, that DNA is cut, using a restriction enzyme to create DNA fragments. This is an enzyme which will cut the DNA strand every time it finds a certain code in the DNA. This code appears many thousands of times, and it will appear in different areas of the DNA chain for different people.

The third step is the electrophoresis procedure, which involves placing the DNA in a gel and passing a slight electrical current through the gel. This causes the DNA fragments to move, resulting in their being separated by size from small to large on a continuum. DNA fragments are measured in terms of the number of base pairs (Bp) or kilobase pairs (Kb). The fourth step involves transferring this array of DNA to a membrane for testing using the southern blot transfer technique. Once this has been done, this membrane can be used repeatedly and stored for long periods of time.

The next step is the hybridization step. This involves the use of specific DNA probes. These probes are fragments of DNA and are designed to recognize a comparable fragment of DNA on the membrane. The probes can be polymorphic or nonpolymorphic. Polymorphic means that the location of the fragment varies greatly among individuals. Nonpolymorphic means it is the same for all individuals. Thus, the use of a nonpolymorphic probe should reveal a DNA fragment in the same location on each membrane. However, use of the polymorphic probe will result in DNA fragments being found in different locations for different individuals. All probes are radioactive. The DNA on the probe binds with the DNA in the sample, leaving a radioactive spot. Once the probes have been applied, the final step, autoradiography, occurs. Here, a piece of X-ray film is placed on top of the membrane, and the radioactive probe creates a picture showing the result of the test. This is referred to as the autoradiograph (or autorad for short). Baird explained these steps are used in all laboratories doing DNA research. The only difference in procedures used by laboratories other than Lifecodes is the type of enzyme used to cut the DNA and the type of probes used. These steps are accepted as reliable by the general scientific community.

Once the autorads are created, then an examination is done involving the forensic sample autorad, the victim's blood autorad, and the defendant's blood autorad, to see if there is a match between the forensic sample and the defendant's blood sample. If an autorad shows that any probe does not match, then the subject is positively excluded. The first step in the matching procedure is performing independent visual exams. These were done independently by the forensic scientist who did the RFLP test and by Lifecodes' three Ph.D.'s. These are done in the blind, meaning that each probe is viewed for a match separately from the other probes.

Baird explained that Deborah Vining was the forensic scientist who performed the test in this case. She has a master's degree and previous forensic experience. She was trained and tested by Lifecodes, and he reviewed her work in this case. It was his opinion that she properly followed all the steps. He explained that in this case they used eight probes. One was a bacteria probe to check for contamination. Two were nonpolymorphic probes to ensure there was no shifting or any other difficulty with the test procedures. Finally, there were five polymorphic probes to be used for the matching. He showed the court the actual matching of defendant's blood sample with the forensic sample. He also explained that if there had been a problem

with contamination, it would most likely have produced a negative result.

Baird stated that the comparison is made visually and also mathematically. If the visual examination determines the presence of a match, then the fragments are sized in terms of Kb pairs (or 1,000 Bp). This is done by measuring how far the fragments moved in the gel, since the smaller fragments move farther than the larger ones. Two measurements of each band are made, and these are averaged. The original measurements are in base pairs or .001 Kb but, when they are averaged, that is done to 10-Bp or .01 Kb. These averages for each band or probe from the forensic sample are compared to the suspect's sample. A match is declared if they are identical. For matching purposes, Lifecodes uses an acceptable error of three standard deviations, or plus or minus 1.8% of the measurement. In this case, all defendant's samples matched numerically with the forensic test.

If a match is found, then a frequency for the occurrence of that particular result must be determined. Lifecodes has an ever-expanding data base for different ethnic groups. This is done using whole blood samples and compiling them in the computer. The method of finding the frequency of a particular band is to take the suspect's results for a given probe and create a bin for that size fragment by taking a range of plus or minus 1.8%. The frequency is then determined by counting the number of occurrences in that bin as compared to the total in the data base. The final frequency of a person's DNA appearing is determined by multiplying the frequencies of the respective probes together. Thus, the more probes used the greater the restriction. In this case, four probes were used originally. These resulted in frequencies of 1 in 58, 1 in 87, 1 in 415, and 1 in 39, or a combined value of 1 in 81.6 million, meaning the likelihood of these four DNA results showing up in any individual is 1 in 81.6 million. Once the fifth probe was added (1 in 84), Lifecodes determined that the relative frequency of this pattern involving these five probes occurring in the black population would be 1 in 6.8 billion.

Dr. P. Michael Conneally also testified. He is a professor of genetics and neurology at Indiana University and teaches genetics. He does research in human gene mapping involving human disease research and is board certified in genetics. He was qualified as an expert witness in human genetics.

Dr. Conneally testified he used the RFLP technology and explained the procedures. These mirrored Lifecodes. He is familiar with Lifecodes and the reputation of the company in the scientific community, and it is good. He explained he is aware of the RFLP procedure

Lifecodes uses, how it determines the frequencies, where its data base comes from, and (having reviewed the autorads) with its work in this particular case. It is his opinion that the procedures used are scientifically acceptable, and that the results in this case are valid conclusions. He has testified at previous *Frye* hearings involving this technology. However, in one case he refused to testify supporting Lifecodes because of his concern over procedures used for matching in that case. He has no such problem in this case.

Dr. Charles Strom is the director of the DNA laboratory at Illinois Masonic Medical Center in Chicago. There, they perform (among other things) forensic analysis of DNA. He explained the RFLP procedure, which he also uses. He has the utmost regard for Lifecodes' work. He believes Lifecodes' RFLP work is accepted in the scientific community. He also believes the numerical-matching procedure using the averages is proper, and he concurred in Lifecodes' result that the defendant's blood matched the forensic sample.

The court, in its order, found that each and every step of the RFLP analysis used for DNA identification is scientifically acceptable and met the *Frye* test. It further concluded that the visual matching procedure and the frequency procedures were likewise accepted. Finally, it found Lifecodes' specific procedures in this case were reliable. Accordingly, it held the DNA fingerprinting procedures and its conclusions would be admissible.

### B. THE TRIAL

The trial commenced on February 6, 1990, with the victim, V.V. testifying first. She stated that on August 26, 1988, around 4:30 a.m., she was asleep in her apartment when she was awakened by a black man entering through the window. He came up to her and told her to put his penis in her mouth. She did so for a short time, and then started pleading for him to leave. He then put a pillow on her face, ripped her panties off, and placed his penis in her vagina. She struggled to no avail. He left through the window and she started screaming. She described him as being 6 feet tall and weighing about 200 pounds.

Her panties and bedspread were taken for evidence, as were swabs from her vagina and rectum. Pursuant to a search warrant, blood and hair samples were taken from defendant. This blood sample, along with the swabs, which showed the presence of semen, and a sample of V.V.'s blood, were sent to Lifecodes for DNA testing and comparison. The hair samples of defendant, along with hair recovered

from V.V.'s panties and combed from her pubic hair were sent to the FBI, along with a sample of V.V.'s hair.

Douglas Deedrick is a special agent with the FBI and stationed in their laboratory. He is assigned to the hair and fiber unit. He has examined over 4,000 cases and was qualified as an expert in this field. He described the procedure in identifying hair. He found defendant's pubic hair to be particularly distinctive. He stated that four hairs were recovered, with two coming from the bedding, one being found in the pubic combings, and one coming from the panties. These all have the same microscopic characteristics as defendant's hair and could have come from him. He acknowledged he could not exclude that these hairs could have come from someone else. However, he explained that defendant's pubic hair is very distinctive, and that the four questioned hairs are mirror images of defendant's hair and were exceptional in their match.

Deborah Vining, the forensic scientist at Lifecodes in charge of this case, was qualified as an expert. She testified concerning the RFLP procedure she used and the hybridizations she performed. These were done on the defendant's blood sample, V.V.'s blood sample, and the semen recovered from the swabs. Other employees testified concerning the hybridizations they did on this case. It was explained that Lifecodes' employees take turns doing the hybridizations because the probes are radioactive. Vining identified the autorads developed. It was her opinion, based on her professional experience, from a visual review of the autorads, that for each probe the DNA of the semen sample matched the DNA of defendant's blood.

Melinda Keel is a forensics administrator at Lifecodes. She performed approximately one-half the sizings or measurements in this case. She explained the procedure, which involves the use of a computer. The measurer uses a computer mouse, which is placed on the autorad to give the computer the general parameters of the field to be measured. The mouse is then placed on the center of a given band and a button is pushed. The computer then generates the size. To ensure everything is functioning properly, the first bands sized are the control bands from the nonpolymorphic probes. The computer has been programmed in advance with the proper measurements for these, and it will show the accuracy of the given measurement. If the deviation is greater than 2%, there is a problem. In the present case, all the measurements were within the margin of error. Each band is sized twice and then averaged. She did the first sizing for each of the first four probes. Dr. Kevin McElfresh, a Ph.D. employed as an assistant director of Lifecodes, did the second. When his measurements

were done, she averaged the blood measurements but not the semen measurements.

Dr. Conneally was again qualified as an expert. He explained DNA and DNA testing for the jury. He gave his opinion that upon review of the autorads, the DNA in defendant's blood sample matched the DNA in the semen sample for each probe. He then described his reasoning to the jury, using the autorads, and he explained how the frequency of a given pattern appearing in the population is arrived at. Conneally stated that based upon his review of Dr. Baird's final report, the total pattern of all five probes would occur approximately once in seven billion individuals. He explained there are five billion people in the world, and 270 million in the United States. Thus, it would be highly unlikely that there is even one individual in the United States other than defendant that would have this band pattern.

Dr. Baird was again qualified as an expert. He explained that after the first four hybridizations were completed, sized, and averaged, it was determined that a fifth should be done. He personally sized and averaged this measurement. He explained the numerical matching process and stated that the results from the fifth probe showed a match within the margin of error between defendant's blood and the semen sample. He reviewed the earlier work and averaged the evidence bands. It was his opinion, based upon a visual comparison of the autorads, that in all five cases the patterns found in the semen sample matched those in defendant's blood sample. He then explained his analysis to the jury. He also gave an opinion on the probability of these five patterns occurring in the population. He relied on all the reports, the sizings done by Keel and McElfresh, a review of the autorads, and comparison of the fragment sizes of Lifecodes' data base in reaching his opinion. His opinion is that the probability of these five patterns occurring in the North American black population are 1 in 6.8 billion.

Finally, Dr. Strom testified. After being qualified as an expert, he also explained the RFLP analysis and DNA testing in general. He also expressed his opinion that the semen sample is a match to defendant's blood sample. This is based on his review of the autorads and his knowledge of techniques in molecular genetics.

Defendant was found guilty, and a sentencing hearing was held on May 7, 1990. At the hearing, evidence was presented demonstrating defendant's involvement in the K.R. sexual assault. The court stated that it felt compelled by section 5—8—4 of the Unified Code of Corrections (Corrections Code) (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—

4) to impose consecutive sentences on these two counts. Accordingly, the court imposed an 12-year sentence on each count, with these to be served consecutively. He made these offenses consecutive to a seven-year sentence defendant is currently serving. This appeal followed.

## II. ANALYSIS

Defendant raises numerous issues in this case. Most of them center around the search warrant which allowed the State to recover samples of defendant's hair, blood, and saliva and the testimony concerning the DNA identification.

### A. SEARCH WARRANT

Defendant initially raises two arguments concerning the search warrant issued allowing seizure of his hair, blood, and saliva. He first argues that the court erred in denying his request for a hearing pursuant to *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674. He also argues that the search warrant should have been quashed for lack of probable cause.

On September 26, 1988, University of Illinois police investigator Krystal Fitzpatrick appeared before the circuit court seeking the questioned search warrant. The complaint sought samples of defendant's pubic hair, head hair, blood, and saliva which constituted evidence of aggravated criminal sexual assault. In the affidavit it was alleged by Fitzpatrick that:

(1) She learned through police records of a sexual assault which occurred at 1107 South Second, Champaign, on the night of July 22, 1988, in which the suspect was a young black man with a muscular build who gained access through a sliding glass patio door.

(2) She learned through police records that on September 13, 1988, Suzanne Fish contacted the police about a black man standing at her balcony window on August 8, 1988, at 10:55 p.m. "No police report was done, but the police stopped a black male as Fish watched from her window. Fish stated that in her mind it was the same man." A field interrogation card completed by the officer involved identified defendant as the person stopped.

(3) On September 14 and 15, 1988, a stakeout of 1107 South Second took place. The police had been given the name of defendant, his picture, and a possible vehicle identification prior to the stakeout. At approximately 2:35 a.m., defendant was seen driving in the area. Minutes later, he was seen on the sidewalk in front of 1107 through 1111 South Second Street and was entering the doorway. As the police approached, defendant left through another door and ran to his car. He

was identified by an officer at the scene, and he was stopped minutes later in his car on First Street.

(4) She learned through police reports and interviews with the victim K.R. that on July 30, 1988, at 1107 South Fourth, Champaign, she was sexually assaulted vaginally and orally by a young black man who gained access through a sliding glass door and who kept the lower portion of his face covered.

(5) She showed K.R. an array of six photographs on September 22, 1988. "[K.R]. selected out 2 photographs, covered the lower portion of the photographs, and picked out Vincent Lipscomb. [K.R.] said the hair was similar, the face was right, and it gave [K.R.] a cold feeling to look at it."

(6) She learned from police reports that on July 29, 1988, defendant was stopped as a burglary suspect in the 900 block of South Third Street. He told the officer he often stays at 1107 South Fourth, apartment No. 36, with high school friends.

(7) She learned that apartment No. 36 was leased to three people. One went to high school with defendant and another high school classmate had personal effects in the apartment.

On March 31, 1989, defendant filed his motion requesting a *Franks* hearing. To this motion were attached several police reports. Defendant argued that Fitzpatrick mischaracterized some items from the reports in the search warrant complaint, and that he is therefore entitled to an evidentiary hearing to determine whether the allegations were false and were made either intentionally or with a reckless disregard for the truth. The court denied the request, finding that defendant failed to make the requisite preliminary showing to require a *Franks* hearing. Defendant believes this conclusion is incorrect.

■ The purpose of the *Franks* rule is to allow limited challenges to the veracity of statements in complaints for search warrants and to allow, as a sanction, suppression of seized evidence when an officer has committed fourth amendment violations by using false statements to support the search warrant. (*People v. Lucente* (1987), 116 Ill. 2d 133, 153, 506 N.E.2d 1269, 1277.) The United States Supreme Court explained the procedure as:

> "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of per-

jury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 155-56, 57 L. Ed. 2d at 672, 98 S. Ct. at 2676.

The linchpin of the *Franks* procedure is the "substantial preliminary showing" requirement. (*Lucente*, 116 Ill. 2d at 147, 506 N.E.2d at 1274.) To establish this, the defendant's challenge must include allegations of deliberate falsehood or reckless disregard for the truth, and these allegations must be accompanied by an offer of proof. (*Franks*, 438 U.S. at 171, 57 L. Ed. 2d at 682, 98 S. Ct. at 2684.) A deliberate omission of a material fact is also a reckless disregard for the truth for *Franks* purposes. *People v. Stewart* (1984), 105 Ill. 2d 22, 43, 473 N.E.2d 840, 850.

■ In determining the level of evidence necessary for the hearing, the *Lucente* court observed that it is somewhere between mere denials by the defendant on one hand and proof by preponderance of the evidence on the other. (*Lucente*, 116 Ill. 2d at 152, 506 N.E.2d at 1276-77.) The determination in any given case must be based on a careful balancing of statements in the warrant affidavit with those in support of defendant's challenge. (*Lucente*, 116 Ill. 2d at 152, 506 N.E.2d at 1277.) As long as the trial court's judgment is exercised within permissible limits, that judgment will not be disturbed on appeal. *Lucente*, 116 Ill. 2d at 153, 506 N.E.2d at 1277.

In the case at bar, defendant attached various police reports to his motion. His basic contention of false statements involves the two statements contained in the search warrant affidavit which were quoted earlier. Defendant's first contention is with the incident involving Suzanne Fish. He observes the police report states, "[Fish] stated that *she was unable to positively identify the subject as the one that looked in her window* [(emphasis added)], but in her mind she was sure that he was the same man." Defendant points out that the emphasized portion was left out of the search warrant affidavit.

His second contention includes the incident involving K.R. He again observes that the police report states:

"*[K.R.] selected the photo numbered 21070, Vincent Lipscomb, as closely resembling her assailant. [K.R.]* placed a piece of paper over the photograph partially covering the face as would have been with her assailant due to the white cloth around his

face the night of the attack. [*K.R.*] told the writer that *she was not positive this was the individual who attacked her*, however, she felt the face structure closely resembled her assailant and, in her words, when she looked at the photograph she had a 'cold feeling' from viewing the picture of Lipscomb." (Emphasis added.)

He again points out the emphasized language is missing from the affidavit.

In denying defendant's motion, the court, observing that the *Franks* Court referred to the necessity that defendant's challenge be supported by affidavits or other sworn material, found that the police reports were not sufficient to establish the substantial preliminary showing because they were not the type of documentation required by *Franks*. The court also concluded that even if they were acceptable, defendant still did not make his case since the differences alluded to were mainly semantics and their inclusion would not have affected the probable cause for the warrant.

Defendant contends that both these conclusions are erroneous. However, since we agree with the second, we need not address the first.

■ In *Stewart*, our supreme court observed that omissions by the police could be raised in pursuing a *Franks* hearing. It made clear that not all omissions, even if intentional, are sufficient to invalidate an affidavit. (*Stewart*, 105 Ill. 2d at 43, 473 N.E.2d at 851.) It concluded, "The defendant must show that the information omitted was material to the determination of probable cause and that it was omitted for the purpose of misleading the magistrate." *Stewart*, 105 Ill. 2d at 44, 473 N.E.2d at 851.

■ Defendant, of course, maintains the omissions do make a difference. He argues that K.R. said defendant's picture resembled her assailant and that she could not positively identify defendant, yet the affidavit suggests otherwise. Again, with Fish, he argues that she also could not positively identify defendant and the affidavit indicates differently.

However, as the trial court found, the questioned paragraphs in the complaint do not indicate the witnesses could positively identify defendant. Rather, a fair reading would lead to the conclusion that they could not do so. Accordingly, since the omitted information does not change the essence of the questioned paragraphs, it is apparent this information would not impact the ultimate ruling on a probable cause for the search warrant and the court properly denied the *Franks* request.

This leads us naturally to the next issue, which is whether probable cause for a search warrant did exist. Defendant argues it did not. He believes the affidavit to the warrant failed to establish probable cause linking him to the crime and that it failed to establish a nexus between the evidence sought and the crime committed.

■ Our supreme court has observed that in reviewing the sufficiency of a search warrant complaint, it is only the probability, and not a *prima facie* showing, of criminal activity which is the standard of probable cause. (*People v. Gacy* (1984), 103 Ill. 2d 1, 21, 468 N.E.2d 1171, 1177.) The affidavits or evidence presented in support of a search warrant must be tested and interpreted in a commonsense and realistic manner. (*People v. Parker* (1968), 42 Ill. 2d 42, 45, 245 N.E.2d 487, 489; *Gacy*, 103 Ill. 2d at 21, 468 N.E.2d at 1177.) The courts, in deciding the question of probable cause, are not disposed to be unduly technical but, rather, the probabilities considered are the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. (*People v. Free* (1983), 94 Ill. 2d 378, 400, 447 N.E.2d 218, 228.) The determination of probable cause by the issuing court should be paid great deference by the reviewing court (*Stewart*, 105 Ill. 2d at 49, 473 N.E.2d at 853; *Gacy*, 103 Ill. 2d at 21, 468 N.E.2d at 1177), and will not be disturbed unless it is manifestly erroneous (*Free*, 94 Ill. 2d at 401, 447 N.E.2d at 229).

■ We have no such difficulty with the trial court's determination. The victim K.R. did indicate, though she could not positively identify defendant, that he looked like the perpetrator. The further allegations show that an assault occurred at 1107 South Second, Champaign, two blocks away from K.R.'s location, and involved a similar *modus operandi*; during the stakeout defendant was seen cruising the scene, entering the 1107 South Second Street building, and fleeing from the police; Fish believed the man ultimately identified as defendant was looking in her window; and defendant stated he spent time in the area at his friends' apartment.

It is necessary to remember that the question to be addressed is whether the affidavit presents a probability of the criminal activity based on a commonsense and practical analysis. K.R.'s selection of defendant's picture from the lineup, while she cannot positively identify him, is practically sufficient by itself to establish the requisite probable cause. All these latter items bolster that selection and result in a sufficient probable cause for the warrant.

■ Defendant next contends the warrant fails to establish a sufficient nexus between the assault and the need for evidence it seeks, which is defendant's blood, saliva, and hair. The warrant does, in fact,

fail to allege that there was any hair, sperm, or blood recovered from the assault to which this evidence could be compared. However, this failure does not invalidate the warrant.

The required nexus may be established through normal inferences. (See *United States v. Freeman* (5th Cir. 1982), 685 F.2d 942, 949.) It is a reasonable inference, based on a commonsense approach, that when oral and vaginal sexual assault are alleged these items may be present. Accordingly, we conclude, in these circumstances, that the required nexus exists.

■ Further, the United States Supreme Court has created a good-faith exception to search warrants in *United States v. Leon* (1984), 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405, which Illinois adopted in *People v. Stewart* (1984), 104 Ill. 2d 463, 477, 473 N.E.2d 1227, 1233, and which has now been incorporated in sections 114—12(b)(1) and (b)(2) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, pars. 114—12(b)(1), (b)(2)). The exception provides that, if the police act pursuant to a search warrant issued by a neutral judge that is not obviously defective and upon which the officer reasonably relied, then the evidence should not be suppressed even if probable cause is lacking. (Ill. Rev. Stat. 1989, ch. 38, pars. 114—12(b)(1), (b)(2); *People v. Bohan* (1987), 158 Ill. App. 3d 811, 817-18, 511 N.E.2d 1384, 1389.) The present case is exactly the situation for which this exception was created. Assuming *arguendo* that the nexus is required to appear in the complaint, the fact that it is missing is not the sort of error which would make the warrant "obviously defective." The officers' reliance on the warrant was reasonable, and the good-faith exception applies.

We wish to emphasize that evidence of this nature was recovered at the K.R. assault. If, in fact, such evidence did not exist for any number of reasons, then a *Franks* motion alleging a material omission which affects the finding of probable cause may be appropriate.

### B. DNA FINGERPRINTING ISSUES

Defendant next raises various issues concerning the DNA fingerprinting evidence. He maintains that (1) the court improperly applied the *Frye* test for adoption of new scientific techniques and that a proper application would result in the evidence being found inadmissible; (2) the court erred in allowing an expert witness to rely on a report generated by Lifecodes in issuing an opinion; and (3) the court erred in allowing the expert to state that a statistical probability of a match of all five bands is 1 in 6.8 billion.

■ In *People v. Eyler* (1989), 133 Ill. 2d 173, 549 N.E.2d 268, *cert. denied* (1990), 498 U.S. 881, 112 L. Ed. 2d 174, 111 S. Ct. 215, the Illinois Supreme Court most recently adopted and applied the standard set forth in *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, for evaluating the admissibility of new scientific techniques. The court quoted the following explanation from *Frye*:

> " 'Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.' 293 F. at 1014, quoted with approval in *People v. Baynes* (1981), 88 Ill. 2d 225, 241[, 430 N.E.2d 1070]." (*Eyler*, 133 Ill. 2d at 211, 549 N.E.2d at 285.)

The determination whether the State has met this standard is placed in the discretion of the trial court and will not be reversed absent an abuse of that discretion. *Eyler*, 133 Ill. 2d at 211-12, 549 N.E.2d at 285.

The court made a detailed and exhaustive finding at the conclusion of the *Frye* hearing. It initially found the principle that the DNA of an individual is unique to that individual and the six-step procedure used in developing the autorads are generally accepted in each of the fields in which DNA fingerprinting belongs. Defendant acknowledges having no difficulty with this conclusion. The court then addressed defendant's concerns about the visual matching process. The court observed it had the opportunity to see Baird, Strom, and Conneally work with the autorads and explain the procedure. It stated:

> "This Court was, in all candor, favorably impressed and persuaded. Moreover, no testimony was presented to suggest that a properly qualified examiner cannot accurately and reliably visually determine whether or not bands produced by a probe, in the DNA from the evidence sample, match bands produced by the same probe in DNA extracted from the suspect's blood. The process is even more reliable when the visual observations are further checked by measurement of the bands. The Court is convinced that the process whereby the autoradiographs or autorads are generated and interpreted for forensic or identification purposes, is generally accepted in the relevant scientific fields."

The court then discussed the binning techniques, the development of the frequencies, and the procedure used in multiplying them to determine the ultimate frequency of the pattern. It concluded, again, that these procedures are generally accepted in the field of genetics and forensic science. The court then stated:

"In summary, the Court finds that DNA fingerprinting, as described and conducted in this case, is generally accepted within the particular scientific fields in which it belongs, specifically molecular biology, genetics, population genetics and forensic science."

The court then explained that it had concluded the *Frye* standard applies only to the admissibility of DNA fingerprinting generally and, at that point, the issue becomes whether the specific procedures used by Lifecodes to generate the evidence are reliable.

The court then went into a long analysis of Lifecodes' procedures. It discussed the procedures used developing the autorads, the controls used, the type of probes used, Lifecodes' reputation in the scientific community, Conneally and Strom's opinions of Lifecodes' work, the method of interpretation used in this case, Lifecodes' averaging and binning, and the development of the frequencies. The court concluded that the State had met its burden under *Frye* and that "the specific results achieved are sufficiently reliable, or at least have not been shown to be so unreliable that the court should exercise its discretion and prohibit the admission of this testimony at trial."

It is defendant's position that the court improperly bifurcated the *Frye* analysis. He observes the court concluded that the specific Lifecodes' procedures are not subject to the *Frye* test. He argues that, in fact, the specific procedures Lifecodes uses for sizing, averaging, declaring numerical matches and frequencies should be subject to *Frye*. He insists that Lifecodes, by the literature it puts forth, suggests that its DNA-Print Identification Test is a new scientific technique. Thus, he believes all its facets should be subject to *Frye*.

He argues if this were done the evidence would be found inadmissible. He points to a disagreement between Strom and Baird over a portion of Lifecodes' procedures and insists that the fact there is such a disagreement shows that Lifecodes' procedures are not generally accepted in the scientific community. Parenthetically, we believe defendant is overstating the extent of this "disagreement." However, that is not particularly relevant because we find that the court's procedure and conclusions are proper.

*Frye* applies to new scientific principles or discoveries. (*Frye*, 293 F. at 1014.) It is clear the principle involved in this case is the general

DNA forensic analysis which the court enumerated. The evidence establishes that at least two companies, Lifecodes and Cellmark, as well as the FBI, are currently performing forensic DNA analysis. Each has its own specific procedures within the general DNA analysis framework. For example, each has its own set of probes to find certain bands. Each may have a different standard of error and different procedures for binning. Also, each has a different base for measuring frequencies of occurrences. The fact that different companies, agencies, or experts have different procedures in implementing the DNA identification analysis does not affect the fact that the new scientific principle involved is the DNA identification analysis and not the respective procedures used within that framework.

■■■ Accordingly, we conclude, and so now hold, that the DNA identification or fingerprinting procedure, as discussed by the trial court, is generally accepted within the particular scientific fields involved and is admissible. This includes the six-step RFLP procedure used in developing the autorads, the visual interpretation of these autorads, the manner of determining the bins, the development of frequencies, and procedure whereby the individual frequencies are multiplied together to determine the ultimate frequency of the pattern.

Any question concerning the specific procedures used by the company or expert goes to the reliability of the evidence and is properly considered by the jury in determining what weight to give to this evidence. If it is shown that the procedures used give an unreliable result, then the court may find it necessary to exclude this evidence entirely.

As applied to the present case, the above analysis establishes that the DNA fingerprinting analysis in general is admissible. Defendant's questions about Lifecodes' procedures go to the reliability and weight of the evidence. The much-discussed disagreement between Strom and Baird involves a question of the range of the deviation permissible in declaring a numerical match. The court concluded this disagreement was not such as would affect the ultimate admissibility of Lifecodes' work. We agree. The evidence establishes that Drs. Conneally, Strom, and Baird were in agreement that in all other aspects the procedures and results were proper. This "disagreement" does not discredit the entire procedure since it at most, and again we believe it is overstated, affects the reliability of the numerical matches Lifecodes would find. However, as discussed later, there was no evidence presented at trial of the presence of numerical matches. Accordingly, this disagreement is properly for the trier of fact to consider in determin-

ing what weight to give to the DNA evidence and does not affect its admissibility.

At trial, defendant objected to the court allowing Dr. Baird to give an opinion on the probability of the five bands occurring in the population, maintaining that Dr. Baird should not be able to rely on the sizings and averages performed in the final report. The court, in ruling on the motion, observed that Dr. McElfresh did not testify as to how he performed the sizings he made and, therefore, these are not substantive evidence. It did note that Keel's sizings and averages were properly before the court and were substantive evidence. However, after considering the evidence, the court concluded that the sizings, averages, and frequency statistics included in the final report are proper for Dr. Baird's expert opinion pursuant to *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322. Defendant maintains this decision is erroneous.

In *Wilson*, the supreme court formally adopted the Federal Rules of Evidence 703 and 705 (Fed. Rules Evid. 703, 705), which allow an expert to base his opinion on facts not in evidence. Rule 703 provides:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." (Fed. R. Evid. 703.)

The court observed "the key element in applying Federal Rule 703 is whether the information upon which the expert bases his opinion is of a type that is reliable." (*Wilson*, 84 Ill. 2d at 193, 417 N.E.2d at 1326.) The ultimate determination as to whether these facts or the data upon which the expert relies are the type reasonably relied upon by those in the field rests within the sound discretion of the trial court, and it will not be disturbed on appeal unless there has been an abuse of that discretion. *City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 186, 554 N.E.2d 1381, 1389.

Defendant's arguments are predicated upon the fact the final report is based in part on sizings done by Dr. McElfresh, and he did not testify. At trial, Keel testified that she performed the first sizings on the first four probes and averaged her sizings and those of McElfresh for the blood bands. Vining recalculated these averages. Baird testified he performed both sizings for the fifth probe, averaged all these bands including the evidence band, and averaged the evidence band for the other probes. Thus, the only figures that are not properly be-

fore the court are the second sizings of the first four probes done by McElfresh.

Defendant's first contention is that the report should not have been used because McElfresh's figures were prepared in anticipation of litigation. He relies on *Dugan v. Weber* (1988), 175 Ill. App. 3d 1088, 530 N.E.2d 1007. That court observed that the issue facing it was whether Rule 703 allows an expert to base his opinion on non-treating physician reports formed solely for purposes of trial, or whether it permits only those facts and data normally relied on by physicians in their practice of treating patients. The court concluded after a review of *Wilson* that a report prepared for litigation is not the type reasonably relied upon by experts in forming opinions in the course of their medical practice. (*Dugan*, 175 Ill. App. 3d at 1099, 530 N.E.2d at 1014.) Accordingly, it concluded the expert witness could not rely on this report. Defendant argues that similarly, in the present case, McElfresh's sizings were done in anticipation of this trial and are not the sort to be relied upon.

However, we find defendant's argument misplaced. To the extent that defendant is asserting that *Dugan* creates a blanket rule that all reports prepared in anticipation of litigation do not satisfy *Wilson*, we believe he is overstating the holding. The *Dugan* court was simply performing conventional *Wilson* analysis. The cornerstone of *Wilson* and Rule 703 is that the facts or data upon which an expert bases an opinion need not be admissible in evidence if they are the type reasonably relied upon by experts in the particular field in forming opinions and inferences. In *Dugan*, a defense expert witness, a physician, had examined plaintiff and prepared a report on his injuries. Unfortunately, this witness was unavailable for trial. Defendant then sought to have another physician render an opinion based on this report. The court concluded this report is not the sort reasonably relied upon by experts in forming opinions in the course of their medical practice. (*Dugan*, 175 Ill. App. 3d at 1099, 530 N.E.2d at 1014.) Accordingly, it would not allow the testimony. While, quite frankly, we have difficulty with this conclusion, we believe this holding is best left to its particular facts and does not create the asserted broad rule.

Further, the tests and reports prepared in this case were done for investigatory purposes and not in preparation of trial. The question presented to Lifecodes was whether a match existed between the forensic sample and defendant's blood sample. It was not until it was determined that such a match existed that the probability of litigation and these test results being used in trial became a likelihood. In fact, the initial testing was completed and the results were returned prior

to defendant being indicted for the instant offense. Thus, even if *Dugan* did create a blanket rule, it is inapplicable to our situation.

Defendant also asserts the State cannot establish Dr. Baird's reliance on the report is reasonable and that he had no opportunity to challenge the figures or effectively cross-examine Baird because Baird had no independent knowledge of McElfresh's procedures. However, these arguments also must fail.

■ Where the issue is admission of an expert's entire opinion, the trial court should liberally allow the expert to determine what materials are reasonably relied upon by those in his field. (*Melecosky v. McCarthy Brothers Company* (1986), 115 Ill. 2d 209, 216, 503 N.E.2d 355, 358; *Lovelace v. Four Lakes Development Co.* (1988), 170 Ill. App. 3d 378, 383, 523 N.E.2d 1335, 1339.) It is, then, the opponent's responsibility to challenge the sufficiency or reliability of the basis for the expert's opinion during cross-examination, and the determination of the weight to be given the expert's opinion is left to the finder of fact. *Melecosky*, 115 Ill. 2d at 216-17, 503 N.E.2d at 358; *Lovelace*, 170 Ill. App. 3d at 384, 523 N.E.2d at 1339.

■ Dr. Baird testified that this final report, and the measurements in it, is the type relied upon by experts in the field. This opinion was also supported by Conneally. This is a sufficient basis to establish that this report meets the *Wilson* standard. It is then up to defendant to attempt to discredit the opinion based on this report by showing, for example, that Baird's reliance is misplaced since he has no knowledge as to the specific steps McElfresh used.

■ Defendant next contends the court erred in allowing the experts to testify to the statistical probability of a match of all five bands. Baird was allowed to testify that in his opinion, based on the final report, the likelihood of a match of all five bands in the black population was 1 in 6.8 billion. Dr. Conneally expressed a similar opinion. It was explained that since only five billion people live in the world, the likelihood of a second match was obviously extremely remote.

Defendant bases his assertion of error on *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734. There, the witness testified that the probability of an accidental match of the blood pattern present in that case was 1 in 500. The court found this was plain error. It observed that thousands of people share these characteristics and this statistic did little to limit the field. It further observed that it believed testimony of statistical probabilities encouraged the jury to disregard traditional analysis of the evidence and focused unfairly on the numerical conclusions. Since the case was factually close, the

court believed this evidence unduly prejudiced the jury and was reversible error. *Harbold*, 124 Ill. App. 3d at 383, 464 N.E.2d at 749-50.

The trial court, in allowing the testimony, relied on this court's more recent opinion of *People v. Redman* (1985), 135 Ill. App. 3d 534, 481 N.E.2d 1272. There, the expert testified that only 1.8% of the Caucasian population would have all three blood characteristics of the defendant. The court reviewed *Harbold*, as well as some other cases. It concluded that the statistics were admissible as relevant to identification, and that any challenge to their reliability went only to the weight to be given the evidence. (*Redman*, 135 Ill. App. 3d at 540, 481 N.E.2d at 1277.) Obviously, this conclusion is controlling here and resolves the present question.

Moreover, a similar conclusion would be appropriate even under *Harbold*. A major concern of the *Harbold* court was that the 1-in-500 statistic did not limit the number of possible defendants:

> "Absent a sound basis to limit the number of possible defendants, the defendant here is but one of thousands of people who share these same characteristics." (*Harbold*, 124 Ill. App. 3d at 383, 464 N.E.2d at 749.)

However, in the present case that is not a problem. According to the present statistic, it is remote that even one other person in the entire world would match all five bands. The likelihood of several others is infinitesimal. The degree of identification is greatly enhanced. This is why the trial court observed this testimony is much like conventional fingerprint analysis, which works to positively identify the culprit. Accordingly, *Harbold*'s reservations are inapplicable.

### C. TRIAL ISSUES

Defendant's next argument is that the court erred in denying his motion for a mistrial based on the State's failure to supply him all the required discovery materials.

The State's fourth witness was Officer Richard Adkins. It was not until his cross-examination that it became clear the third page of his report was missing from the State's answer to discovery. That page reflects that V.V. gave Adkins the assailant's description as being a black male, 20 to 25 years old, 6 feet 2 inches tall, and weighing about 200 pounds. As it turns out, this is the only document reflecting the fact that she gave this description. Accordingly, during opening statements, defendant's counsel commented that V.V. never gave a description of the assailant. Also during her testimony which occurred earlier, she testified the assailant was 6 feet tall. However, since coun-

sel did not have this information, he could not cross-examine her in that regard. Counsel, making these points, moved for a mistrial.

Defendant now appeals, asserting this failure violates his due-process rights, pursuant to *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and also violates the commands of Supreme Court Rule 412(a)(i) (134 Ill. 2d R. 412(a)(i)).

■■ The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution. (*Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97.) In *United States v. Bagley* (1985), 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383, the Court clarified what it meant by "material" when it stated:

> "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

■■ ■ Somewhat similarly, the failure to comply with Rule 412 does not in all instances necessitate a new trial. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 172, 514 N.E.2d 970, 974; *People v. Greer* (1980), 79 Ill. 2d 103, 120, 402 N.E.2d 203, 211.) A new trial should only be granted if the defendant is prejudiced by the discovery violation and the trial court failed to eliminate the prejudice. (*Cisewski*, 118 Ill. 2d at 172, 514 N.E.2d at 974; *People v. Weaver* (1982), 92 Ill. 2d 545, 550, 442 N.E.2d 255, 260.) Among the factors to be considered in determining whether a new trial is warranted are the closeness of the evidence, the strength of the undisclosed evidence, and the likelihood that prior notice could have helped defendant discredit the evidence. *Cisewski*, 118 Ill. 2d at 172, 514 N.E.2d at 974.

■■ We do not believe the missing report would have this prejudicial effect on defendant's trial. The questioned report showed that V.V. described her assailant as 6 feet 2 inches tall. At trial, she testified he was six feet tall. Considering that she was awakened from her sleep and that she did not have her contact lenses in, we do not find this difference to be material. We are also mindful that this case revolves virtually entirely around the DNA evidence, and any question concerning V.V.'s description of her assailant in this fashion would have little impact. Of greater concern is the fact defendant's counsel told the jury in opening statements that no such description existed. This could result in a negative view of counsel in the jury's eyes and have a detrimental impact on other points counsel wishes to make.

However, the court explained the situation to the jury, made clear this was not due to counsel's fault, and that it should not be considered by the jury. We believe this admonition cured any possible adverse impact in this regard.

Defendant's next contention is that he was not proved guilty beyond a reasonable doubt. The standard of review in sufficiency of the evidence cases is well settled. Once the defendant has been found guilty of the charged crime, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) The relevant question is whether, if after viewing the evidence in such a fashion, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.

It is agreed by all the parties that this case turns upon the validity of the DNA identification evidence and the expert opinions thereon. If the declaration of a match by Baird, Conneally, and Strom is valid, then this evidence, together with the hair fiber testimony, is sufficient. If the matches are improperly declared and this evidence is stricken, then the evidence is clearly insufficient.

Defendant makes his argument based on the absence of a declaration of a numerical match to go along with the visual matches. He maintains that at the *Frye* proceeding and at trial all the experts maintained that both a numerical and visual match were necessary before an actual match could be declared. Since McElfresh did not testify, the court would not admit his measurements in as substantive evidence and, accordingly, would not allow anyone to testify to the presence of a numerical match for calculations using these figures. Defendant believes that without the presence of a numerical match the visual matches alone are insufficient to declare a DNA match.

However, as made clear from the earlier discussion, defendant is mistaken. The trial court held, and we have found properly, that visual identification alone is sufficient under the DNA identification analysis to declare a match. Conneally and Baird both acknowledged the numerical matching is important, but only to corroborate the visual match. There was no testimony that both a visual and numerical match had to be present before a DNA match could be declared. In fact, when all the experts gave their opinions that a visual match existed, not one of them indicated it was necessary to have the numeri-

cal match also before they would declare a match. Accordingly, it is evident that the numerical match is an important tool, but only for corroboration purposes. Thus, the presence or absence of the numerical matches is relevant to the weight the jury should give the expert testimony declaring visual matches, but it is not an essential element that must be proved to sustain the opinion that a match exists under the general DNA identification analysis.

Accordingly, in the present case, it is evident that the expert testimony involving the DNA matching and the hair matching is sufficient, if accepted, to sustain the convictions. Here, the jury accepted this testimony and we do not believe that decision was erroneous.

### D. SENTENCING ISSUE

Lastly, defendant contends the trial court erred in imposing consecutive sentences. At the sentencing hearing, the court found that pursuant to *People v. Segara* (1988), 126 Ill. 2d 70, 533 N.E.2d 802, it was appropriate to impose separate sentences for separate acts of sexual assault committed on the same victim at virtually the same time. It also found that the legislature in section 5—8—4 of the Corrections Code (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4) had made it mandatory that sentences for these offenses should be served consecutively. Section 5—8—4 provides, in relevant part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a *** violation of Section 12—13 or 12—14 of the Criminal Code of 1961, in which event the court shall enter sentences to run consecutively." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a).)

In the present case, defendant was convicted of violations of section 12—14 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 12—14). Thus, section 5—8—4 of the Corrections Code clearly mandates consecutive sentences. Defendant believes this conclusion is incorrect in that it does not allow for the "independent motivation" test for consecutive sentences and that pursuant to *Segara* and *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, only concurrent sentences should be imposed.

We recently addressed application of section 5—8—4 of the Corrections Code in *People v. Lafferty* (1990), 207 Ill. App. 3d 136, 565 N.E.2d 279. In that case, the defendant was convicted of two acts of conduct in violation of section 12—14 for penetrating his victim

once with his penis and once with his finger. The court, pursuant to section 5—8—4, imposed consecutive sentences. Defendant, observing that both offenses occurred on the same day, at the same time, and in the same place, made a similar argument to the one defendant now makes. We concluded that the imposition of consecutive sentences pursuant to section 5—8—4 was proper. *Lafferty*, 207 Ill. App. 3d at 137-38, 565 N.E.2d at 280-81. See also *People v. Ewald* (1991), 210 Ill. App. 3d 7, 10, 568 N.E.2d 451, 453.

The *Lafferty* case obviously presented the identical question now facing us and, accordingly, it obviously calls for an identical resolution. The imposition of consecutive sentences is proper.

For the above-mentioned reasons, the convictions and sentences entered in this case are affirmed.

Affirmed.

SPITZ and GREEN, JJ., concur.