**Richmond**

PAUL J. HUSSKE, s/k/a

PAUL JOSEF HUSSKE

v.

COMMONWEALTH OF VIRGINIA

No. 0829-92-2

Decided September 20, 1994

Counsel

Steven D. Benjamin (Benjamin and Associates, on briefs), for appellant.

Virginia B. Theisen, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

**BENTON, J.**—The trial judge, sitting without a jury, convicted Paul Josef Husske of forcible sodomy, rape, robbery, and breaking and entering with intent to rape. Husske contends that the trial judge erred in holding (1) that the Commonwealth was not required to provide to him, an indigent defendant, expert assistance to defend against the Commonwealth's expert testimony concerning deoxyribonucleic acid (DNA) analysis and (2) that his incriminating statements to a mental health counselor were admissible and not barred by the Fifth and Fourteenth Amendment privileges against self-incrimination. We hold that the trial judge erred in both instances. Thus, we reverse Husske's convictions and remand for a new trial.

## I.

In June 1990, a man broke a window and entered a woman's apartment. After striking the victim in the head and face, the intruder pulled the victim's skirt over her face. The intruder committed acts of cunnilingus, rape, and robbery against the victim. The intruder also caused the victim to commit an act of fellatio. Although the victim heard the intruder's voice and saw enough of him to conclude that he was a Caucasian male, she did not see his face well enough to identify him. No one was immediately arrested for the offenses. After the attack, the police retrieved fluids suitable for genetic testing from a cervical swab of the victim and from a stain on the victim's skirt.

Ten months later, Husske was arrested and charged with forcible sodomy, robbery, rape, and breaking and entering with the intent to commit rape. Husske moved before and during the trial for the appointment of an expert in DNA analysis to assist him in his defense. The trial judge refused to appoint such an expert, but prior to trial he appointed as co-counsel to Husske's trial counsel a second attorney who was represented to be "the most knowledgeable member of the local bar in the area of forensic DNA application." The trial judge stated that he had no authority to appoint expert assistance for Husske.

At trial, Marion S. Vanti, an employee of the Commonwealth's Division of Forensic Science, and Dr. Bruce Spencer Weir, a professor of statistics and genetics at North Carolina State University, testified for the Commonwealth as expert witnesses on DNA

analysis. Both testified that Husske's DNA profile matched the profile of the person who assaulted the victim.

Vanti testified that the DNA analysis did not exclude Husske as a contributor of the genetic material found in the victim's body and on the victim's clothing. Over the objection of Husske's counsel, she testified concerning the Federal Bureau of Investigation's DNA database. She testified that the population in the database used by the FBI was in Hardy-Weinberg equilibrium and that the statistical probability of randomly selecting a person unrelated to Husske in the Caucasian population with the same DNA profile was 1 in 700,000.

Professor Weir testified that his "unbiased estimator" of the likelihood of a randomly selected Caucasian bearing the same DNA profile as Husske was 1 in 700,000. He also testified that his "lower confidence limit" estimate of the same likelihood was "not more than 1 in 400,000." Professor Weir stated that by the term "lower confidence limit" he meant that ninety-nine percent of the times he conducted the procedure for determining probability of a match his answer would be 1 in 400,000. Professor Weir based these estimates of the likelihood of another randomly selected Caucasian person having the same DNA pattern as Husske on a database compiled by the FBI. Professor Weir testified on cross-examination that there was no controversy in the scientific community about the validity of the FBI database.

At the close of the Commonwealth's evidence, Husske renewed his motion for expert assistance and in support of the motion proffered reports, testimony, articles, case law, and other documents that purported to show that challenges have been raised regarding the statistical data and assumptions used by the FBI to calculate the likelihood of a match between a randomly selected person and the person whose bodily material was subject to DNA analysis. The trial judge again denied the motion. At the close of the evidence, the trial judge convicted Husske of all charges.

## II.

Citing *Ake v. Oklahoma*, 470 U.S. 68 (1985), Husske contends that "the Fourteenth Amendment's due process guarantee of fundamental fairness" entitled him to a court-appointed expert on DNA to assist him in his defense.

■ In *Ake*, the Supreme Court reaffirmed a "long recognized [elementary principle] that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding it must take steps to assure that the defendant has a fair opportunity to present its defense." 470 U.S. at 76. The Court emphasized that the due process concern for "[m]eaningful access to justice" is not satisfied when an indigent defendant is denied "access to the raw materials integral to the building of an effective defense." *Id.* at 77. The Court further stated that:

> [W]hile the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system." To implement this principle, we have focused on identifying the "basic tools of an adequate defense or appeal," and we have required that such tools be provided to those who cannot afford to pay for them.

*Id.* (citations omitted).

Although a concurring opinion stated that "[n]othing in [*Ake*] reaches noncapital cases," 470 U.S. at 87 (Burger, C.J., concurring), the majority's holding did not limit the ruling to capital cases, *see id.* at 83, and the decisional majority was not dependent upon the vote of the concurring Chief Justice. The holding in *Ake* was grounded in a due process analysis. *Id.* at 76; *Moore v. Kemp*, 809 F.2d 702, 709 n.6 (11th Cir.), *cert. denied*, 481 U.S. 1054 (1987). Although *Ake* involved a prosecution for capital murder, nothing in the Court's discussion of "the Fourteenth Amendment's due process guarantee of fundamental fairness," the basic underpinning of the rule announced in *Ake*, suggests that the holding in *Ake* is limited to capital murder cases. *See* 470 U.S. 76-85.

Likewise, when due process considerations are raised to question issues of trial fairness and the lack of an adequate opportunity to present a defense, nothing in *Ake* suggests that the underlying contested issue must relate only to the defendant's sanity. Indeed, *Ake* expressly stated that sanity was not the only issue upon which a defendant was entitled to the assistance of an expert. The Court extended its ruling to the use of expert testimony when "the defendant's future dangerousness" was at issue. 470

U.S. at 83-84. Although dangerousness is an issue that sometimes may relate to sanity, dangerousness does not necessarily relate to issues of sanity. *Cf. Foucha v. United States*, 504 U.S. 71, ____, 112 S. Ct. 1780, 1782-83 (1992); *Estelle v. Smith*, 451 U.S. 454, 472 (1981). In summary, nothing in the majority opinion in *Ake* can be read to preclude the application of the due process analysis to any case in which an expert is necessary to provide the defendant with "a fair opportunity to present his defense." 470 U.S. at 76.

In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the Court found no cause to address whether a defendant was denied the court-appointed assistance of "various experts and investigators in violation of federal constitutional law." *Id.* at 323-24 n.1. However, the majority opinion noted that the "requests were accompanied by no showing as to their reasonableness" and "that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial." *Id.* The Court contrasted those bare assertions with the showing required by *Ake*. Nothing in *Ake* or *Caldwell* remotely suggests that the Supreme Court of the United States would not apply the same due process analysis that it used in an appropriate case of non-psychiatric expert assistance.

Likewise, and contrary to the Commonwealth's arguments, the Supreme Court of Virginia has not specifically ruled that the holding in *Ake* was limited to cases involving insanity or imposition of the death penalty. In *Pope v. Commonwealth*, 234 Va. 114, 360 S.E.2d 352 (1987), *cert. denied*, 485 U.S. 1015 (1988), the trial judge denied a capital murder defendant's motion "to appoint an investigator to 'comb the neighborhood' for potential witnesses." *Id.* at 119, 360 S.E.2d at 356. Although the Court rejected Pope's argument that he was entitled to relief in accord with *Ake*, the Court grounded its reason in *Watkins v. Commonwealth*, 229 Va. 469, 331 S.E.2d 422 (1985), *cert. denied*, 475 U.S. 1099 (1986). In *Watkins*, the Court held consistent with the decisions of the Supreme Court of the United States that the mere " 'fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required.' " *Id.* at 478, 331 S.E.2d at 430 (quoting *Ross v. Moffitt*, 417 U.S. 600, 616 (1974)). *See also Townes v. Commonwealth*, 234 Va. 307, 331-32, 362 S.E.2d 650, 664 (1987), *cert. denied*,

485 U.S. 971 (1988) (that defendant may have benefitted from an expert who might explain to the jury "such tricks of the mind as were or might have been employed by the police" did not mean that defendant was deprived of the ability to present a fair defense). Similar to *Caldwell*, these cases hold only that the defendant failed to make a showing sufficient to establish a deprivation of due process. *See* 472 U.S. at 323 n.1. Consistent with the view that a sufficient showing must be made to establish a deprivation of due process, this Court has implicitly ruled that *Ake's* due process analysis is not limited to capital murder cases. *See Funk v. Commonwealth*, 8 Va. App. 91, 379 S.E.2d 371 (1989) (request for expert in rape prosecution); *Hogan v. Commonwealth*, 5 Va. App. 36, 360 S.E.2d 371 (1987) (request for expert in robbery and malicious wounding prosecutions).

In *Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir. 1987), *cert. denied*, 487 U.S. 1210 (1988), the Eighth Circuit applied the *Ake* rule to a non-capital case in which the reason the indigent defendant sought expert assistance did not involve insanity. The victim's identification of the defendant as the perpetrator occurred while the victim was hypnotized. *Id.* at 1242. The Court held that the state's failure to provide an indigent defendant with an expert in hypnotism violated the defendant's due process right to a fair trial. *Id.* at 1245. The court stated that the rule in *Ake* should be applied even though the expert the defendant requested was not a psychiatrist and the defendant's sanity was not at issue.

> There is no principled way to distinguish between psychiatric and nonpsychiatric experts. The question in each case must be not what field of science or expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given. Nor do we draw a decisive line for due-process purposes between capital and noncapital cases. To be sure, the defendant's interest in staying alive is greater and different in kind from his interest in avoiding a prison term, but the latter interest, in our opinion, still outweighs the state's interest in avoiding the relatively small expenditure that would be required.

*Id.* at 1243-44. *See also Tatum v. State*, 380 S.E.2d 253, 254-55 (Ga. 1989).

■ In a recent case, the Alabama Court of Criminal Appeals upheld an indigent defendant's request for the appointment of expert assistance where DNA analysis was used by the state. The Court held that "*Ake* extends beyond a request for psychiatric assistance to require that the state provide the indigent defendant with other types of expert assistance upon a sufficient showing." *DuBose v. State*, ＿＿＿ S.E.2d ＿＿＿, ＿＿＿ (Ala. Crim. App., September 30, 1993) (see slip op. p. 25). We find persuasive the reasoning in *Little* and *DuBose* and adopt their analyses. Accordingly, we conclude that the principles enunciated in *Ake* and grounded in the due process guarantee of fundamental fairness apply in this case where an indigent defendant makes a proper showing that he or she needs the requested assistance to have "a fair opportunity to present his defense." 470 U.S. at 76.

### III.

In making the determination whether the state was required to provide assistance to an indigent defendant, the Court in *Ake* discussed three controlling factors:

> The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

470 U.S. at 77.

The Court in *Ake* readily concluded, as we do here, that the "private interest in the accuracy of a criminal proceeding that places an individual's . . . liberty at risk is almost uniquely compelling." *Ake*, 470 U.S. at 78. Furthermore, the Commonwealth does not offer any reason why providing a DNA expert in a case such as this would be an undue burden. Indeed, the Commonwealth provided the testimony of two expert witnesses in its case-in-chief. As did the Court in *Ake*, we decline to accept as legitimate any interest the Commonwealth might have in "maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict obtained." *Ake*, 470 U.S. at 79.

The touchstone inquiry is the extent to which the assistance of an expert in this case would have militated against the risk of error if the expert assistance were not provided. Initially, we recognize that the Supreme Court of Virginia accepts DNA analysis as a "reliable scientific technique" that is "generally accepted in the scientific community." *Spencer v. Commonwealth (Spencer I)*, 238 Va. 275, 289, 384 S.E.2d 775, 782 (1989), *cert. denied*, 493 U.S. 1036 (1990). Moreover, in 1990, the reliability of DNA evidence and its admissibility as evidence in the Courts of Virginia was codified. *See* Code § 19.2-270.5. Although the Supreme Court of Virginia has recently reaffirmed that DNA testing is a reliable identification technique, *see Satcher v. Commonwealth*, 244 Va. 220, 238-44, 421 S.E.2d 821, 832-35 (1992), *cert. denied*, ____ U.S. ____, 113 S. Ct. 1319 (1993), *Spencer* and *Satcher* do not hold that all DNA testing procedures and methodologies are equally probative and closed to challenge.

Even though evidence of DNA profile testing is found by courts in many jurisdictions to be generally admissible, issues pertaining to the reliability of results obtained or of the inferences arising from those results have been found to be statistical and thus subject to traditional challenges. *See State v. Pennington*, 393 S.E.2d 847, 854 (N.C. 1990). Indeed, Code § 19.2-270.5 explicitly states that although DNA testing shall be admitted in evidence, "[t]his section shall not otherwise limit the introduction of any relevant evidence bearing upon any question at issue before the court." Husske does not challenge the statute and does not assert that DNA analysis is inadmissible. He argues that the theory supporting DNA analysis is too complex to be comprehended without expert assistance and that the controversy among scientists concerning the statistical calculations derived from the FBI database supported his request for expert assistance.

Elementary explanations of the scientific procedures employed in one method of DNA analysis are given in *Satcher*, 244 Va. at 239-40, 421 S.E.2d at 832-33, and *Spencer*, 238 Va. at 286-89, 384 S.E.2d at 781. *See also* William C. Thompson and Simon Ford, *DNA Testing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va. L. Rev. 45, 61-79 (1989).

Stated *very* simply, there are three general steps in DNA testing:

1. Creating a DNA . . . "profile" of a sample;
2. Determining whether the . . . profiles of different samples match; and
3. If [the] samples match, computing the probability of a random match.

*State v. Bible*, 858 P.2d 1152, 1180 (Ariz. 1993) (footnote omitted).

In equally elementary terms, DNA evidence consists of two findings. The first finding is that a "match" exists between the DNA of the defendant and the DNA found at the crime scene. "When scientists declare a DNA match between a person and an evidentiary trace, they are saying that the person *might* be the source of that trace." Jonathan J. Koehler, *DNA Matches and Statistics: Important Questions, Surprising Answers*, 76 Judicature 222, 224 (1993).

The second finding relates to the statistical probability that the DNA of a randomly selected person from the general population would also match the DNA found at the crime scene. "The probability that accompanies a reported DNA match is the theoretical likelihood that a randomly selected person from the general population (or from the population of certain large ethnic or racial groups) would genetically match the trace evidence as well as the defendant . . . [,] the 'random match probability.' " *Id.*

Following the decisions in *Spencer* and *Satcher*, controversy has erupted in the scientific community concerning some aspects of DNA methodology. As a result of the controversy, the National Academy of Sciences through its Committee on DNA Technology in Forensic Science conducted a study and in April 1992 released a comprehensive report. *See* Report of the Committee on DNA Technology in Forensic Science, National Research Council, *DNA Technology in Forensic Science* (April 1992) ("NRC Report"). The NRC Report analyzes the current methods of DNA typing and acknowledges that elements of certain DNA methodology are the subject of continuing debate in the scientific community. The NRC Report is cited as authoritative in many recent cases due to the prestige of its authorship. "The group of scholars included many highly regarded names in science, medicine, and law. . . . There is not just one author trying to make a point, but rather a group of people that has reached a consensus in rejecting one as-

pect of the current methods of forensic use of DNA evidence." *State v. Anderson*, 853 P.2d 135, 145-46 (N.M. Ct. App. 1993). *See also Fishback v. People*, 851 P.2d 884, 894 (Colo. 1993); *State v. Alt*, 504 N.W.2d 38, 41 (Minn. App. 1993); *State v. Cauthron*, 846 P.2d 502, 504 (Wash. 1993).

The NRC Report states that the population databases used to calculate the random match probability have been criticized as problematic. The NRC Report gives a succinct statement of the problem that is being debated within the scientific community:

> Interpreting a DNA typing analysis requires a valid scientific method for estimating the probability that a random person might by chance have matched the forensic sample at the sites of DNA variation examined. . . .

> To say that two patterns match, without providing any scientifically valid estimate (or, at least, an upper bound) of the frequency with which such matches might occur by chance is meaningless.

> Substantial controversy has arisen concerning the methods for estimating the population frequencies of specific DNA typing patterns. Questions have been raised about the adequacy of the population databases on which frequency estimates are based and about the role of racial and ethnic origin in frequency estimation. Some methods based on simple counting produce modest frequencies, whereas some methods based on assumptions about population structure can produce extreme frequencies. The difference can be striking. The discrepancy not only is a question of the weight to accord the evidence . . . but bears on the scientific validity of the alternative methods used for rendering estimates of the weight. . . .

NRC Report, *supra*, at 74-75 (footnote omitted). This disagreement, which has arisen among population geneticists, is significant because it concerns the methods of calculating population statistics that are used to interpret the significance of the finding of a "match." *Id.* at 79-80.

Typically, analysts compare the DNA of the genetic material and a suspect at four or five loci. *Id.* at 44.

If the bands match in the two samples, for all three or four enzyme-probe combinations, the question is: What is the probability that such a match would have occurred between the suspect and a person drawn at random from the same population as the suspect?

Answering that question requires calculation of the frequency in the population of each of the gene variants (alleles) that have been found, and the calculation requires a databank where one can find the frequency of each allele in the population.

*Id.* at 4.

The statistical validity of the random match probability relies upon the assumption of a population that mates randomly and mixes the gene pool evenly and at the same frequency. Such a population is said to be in "Hardy-Weinberg equilibrium." *Cauthron*, 846 P.2d at 514; *Commonwealth v. Currin*, 565 N.E.2d 440, 444 n.11 (Mass. 1991). Critics contend that the population databases used by the FBI and the two major DNA analysis labs (Cellmark and Lifecodes) are not sufficiently large or random and do not take into account the existence of genetic subgroups (or substructures) within the larger population. *See, e.g., Curnin*, 565 N.E.2d at 444-45 (expert testified "that Cellmark's data base was not adequate for the purpose of producing an estimate of the frequency of finding a particular genotype in the human population"); *Anderson*, 853 P.2d at 144, 146 (experts testified that FBI methodology in computing statistical frequencies is seriously flawed); *Springfield v. State*, 860 P.2d 435, 444-48 (Wyo. 1993) (experts differ as to the reliability of the statistical conclusions arrived at through the FBI's methodology).

Some population geneticists have "expressed serious concern about the possibility of significant substruction" in the population. NRC Report, *supra*, at 12. If genetic substructures or subgroups exist within a larger population, a statistical probability that was determined by using data from the larger group would be inaccurate for a defendant who was a member of a genetic subgroup. *Id.* at 10. The NRC Report recommended further study of population substructure, and, to account for the possible population substructure, the committee "recommend[ed] the use of [a] ceiling principle," which would allow scientists to ignore a defendant's ethnic

background in computing the statistical match probability. *Id.* at 13. One court has recently required that statistical calculations based upon the FBI database must be based upon the modified ceiling principle recommended by the NRC Report. *See Alt*, 504 N.W.2d at 51.

Another criticism centers upon the segments of DNA (often referred to as "alleles") that are visually examined and compared in order to determine a DNA match. It is assumed that the alleles are independent of one another—that they are "linkage equilibrium;" however, their independence is just an assumption and has not been established. NRC Report, *supra*, at 77. If the alleles occur in groupings, the random match probability could be significantly altered. *Id.* at 77-78. If, for example, three alleles are related, it is likely that a person who has one of them has all three of them. *Cauthron*, 846 P.2d at 513.

These issues are significant because, "[e]xcept in cases where the DNA evidence excludes a suspect, assessing the significance of a result requires statistical analysis of population frequencies." NRC Report at 6. Thus, several jurisdictions have ruled that evidence of a DNA match may not be admitted without evidence concerning the statistical probability of the match. *See, e.g., Nelson v. State*, 628 A.2d 69, 75 (Del. 1993) ("DNA matching evidence is inadmissible in the absence of a statistical interpretation of the significance of the declared match"); *Cauthron*, 846 P.2d at 513 (fact of a DNA match has no meaning without the statistical evidence to back it up); *United States v. Yee*, 134 F.R.D. 161, 181 (N.D. Ohio 1991) ("Without the probability assessment, the jury does not know what to make of the fact that the [DNA] patterns match: the jury does not know whether the patterns are as common as pictures with two eyes, or as unique as the Mona Lisa."). In *United States v. Porter*, 618 A.2d 629, 640 (D.C. App. 1992), the Court held that because the probability of a match was an essential part of the DNA analysis and because the scientific community has reached no consensus as to the accuracy of the FBI calculation, the defendant's objection to the use of the FBI calculation was not addressed merely to the weight of the evidence. *See also People v. Barney*, 10 Cal. Rptr. 2d 731, 742 (Cal. App. 1992); NRC Report, *supra*, at pp. 74-75.

In light of the controversies, some states recently have held DNA statistical computations evidence inadmissible because the

methodologies do not possess "general acceptance . . . in the relevant scientific community." *State v. Bible,* 858 P.2d at 1188-89. *See also Anderson,* 853 P.2d at 146 (DNA evidence inadmissible because FBI database lacks general scientific acceptance); *Cauthron,* 846 P.2d at 516 (testimony that defendant's DNA matched DNA found at crime scene erroneously admitted because unsupported by valid probability statistics); *Commonwealth v. Lanigan,* 596 N.E.2d 311, 317 (Mass. 1992) (DNA evidence inadmissible because method used to determine the frequency of the defendant's DNA lacks general acceptance in the relevant scientific community); *Barney,* 10 Cal. Rptr. 2d at 743-44 (determination of statistical significance of DNA match does not have general scientific acceptance); *People v. Mohit,* 579 N.Y.S.2d 990, 996 (1992) (FBI database rejected); *Curnin,* 565 N.E.2d at 442 (results of tests comparing DNA of defendant to DNA found at crime scene held inadmissible because the state did not demonstrate test's general acceptance or inherent rationality).

In codifying DNA's reliability and admissibility, the General Assembly of Virginia did not preclude proof of other relevant evidence. Thus, Code § 19.2-270.5 does not bar proof that some aspects of a scientific technique, once accepted as reliable by the scientific community, may subsequently be deemed unreliable due to the advent of further research and testing. *See Anderson,* 853 P.2d at 139 (a ruling that a scientific technique is reliable and therefore admissible should be regarded as the law only until scientific acceptance has significantly changed); *Cauthron,* 846 P.2d at 506 n.3 (trial court must still undertake *Frye* analysis of a previously accepted scientific theory if one party produces new evidence which seriously questions continued general acceptance of that theory within the relevant scientific community). Indeed, as the NRC Report states, "it is meaningless to speak of the reliability of DNA typing in general—i.e. without specifying a particular method." *Id.* at 8. A California court, for example, rejected a challenge to the DNA random match probability calculations in *People v. Axell,* 1 Cal. Rptr. 2d 411 (1991), but later held them inadmissible. Several months after its decision in *Axell,* the court in *Barney* noted that the current controversy regarding DNA evidence "changes the scientific landscape considerably, and demonstrates indisputably that there is no general acceptance of the current process." 10 Cal. Rptr. 2d at 744. Consequently, the court

held inadmissible DNA random match probability calculations. *Id.*

■ Citing *Moore v. Kemp*, 809 F.2d at 712, the Commonwealth asserts that "[f]or a criminal defendant to establish a constitutional right to appointment of a non-psychiatric expert witness, he must show both that there exists a reasonable probability that the expert would assist him and that the denial of such assistance would result in a fundamentally unfair trial." We conclude that the record in this case makes that showing.

Husske proffered substantial evidence that the FBI statistical database, on which Professor Weir predicated his conclusion that no more than 1 in 400,000 people shares Husske's DNA profile, is based upon assumptions that are subject to ongoing challenges within the scientific community. An expert who could testify to the controversy surrounding the FBI database, or who could have assisted in the cross-examination of Professor Weir's technical analysis, might well have diminished the weight of Professor Weir's testimony. Moreover, in light of Professor Weir's disavowal of knowledge of a controversy surrounding the FBI database, an expert who testified as to the existence of a controversy might even have successfully attacked Professor Weir's credibility. *See State v. Futrell*, 436 S.E.2d 884, 889 (N.C. App. 1993) (because defendant's expert presented testimony that conflicted with the State's expert regarding validity of the FBI statistical procedures, the evidence was subject to the trier of facts' determination as to credibility). Indeed, the materials proffered by Husske included an affidavit filed by an expert in another case stating that Professor Weir may have commented during the conduct of the National Academy of Science study that "the application of the Hardy-Weinberg equation and product rule as currently employed in the FBI's procedure [is not] acceptable." Since both the issues concerning the random match probability and credibility directly implicate the basis for Husske's conviction, the assistance of an expert in this case would have diminished "the risk of error in the proceeding." *Ake*, 470 U.S. at 79.

The testimony of Professor Weir and the Commonwealth's own forensic scientist made clear that DNA analysis is complex and difficult to grasp. Professor Weir himself testified on cross-examination that his graduate students in courses dealing with DNA would, at a minimum, need some abilities in both statistics and

population genetics. This is the type of issue in which "[t]hrough [the] process of investigation, interpretation, and testimony, [expert witnesses] ideally assist [triers of fact], who generally have no training in [the subject], to make a sensible and educated determination about the [subject of expertise]." *Ake*, 470 U.S. at 80-81. The issues related to the DNA analysis raise the same trial process concerns as addressed in *Ake*, where the Court noted that a psychiatrist's assistance might be "crucial" in "analyz[ing] [ ] information and . . . draw[ing] plausible conclusions," as well as knowing "the probative questions to ask of the opposing party's [experts] and how to interpret the answers." *Id. See also Williams v. Martin*, 618 F.2d 1021, 1023 (4th Cir. 1980).

As one commentator stated:

It is imperative . . . that judges, attorneys, jurors, and experts understand the meaning of a reported match and the conditions in which it should have more and less impact on judgments. Experts must be discouraged from overstating the probative significance of a match . . . and encouraged to discuss the significance of relatives and subpopulations in the potential source population. They should also provide candid testimony about the potential for error in DNA analyses. But when zealous experts are not forthcoming about the limitations and shortcomings of DNA evidence, defense attorneys must be prepared to identify and explain the relevant issues in cross-examination and with experts of their own.

Koehler, *DNA Matches and Statistics: Important Questions, Surprising Answers, supra*, at 229. It is also worthy of note that due to the complexities of the underlying methodology supporting DNA analysis, the National Research Council spoke directly to the issue of expert assistance when DNA evidence is produced in a legal context.

Defense counsel must have access to adequate expert assistance, even when the admissibility of the results of analytical techniques is not in question, because there is still a need to review the quality of the laboratory work and the interpretation of results. When the prosecutor proposes to use DNA typing evidence or when it has been used in the investigation of the case, an expert should be routinely available to the

defendant. If necessary, he or she should be able to apply for funds early in the discovery stages to retain experts without a showing of relevance that might reveal trial strategy. Whenever possible, a portion of the DNA sample should be preserved for independent analysis by the defense.

NRC Report, *supra*, at 147.

By demonstrating the existence of a significant controversy within the scientific community concerning the random match probability and the potential effect of that issue upon the DNA evidence offered by the Commonwealth at trial, Husske made a sufficient showing of a need to have an expert to assist in his defense, to develop the shortcomings in the DNA methodology used by the Commonwealth's witnesses, and to explain the current controversy surrounding the reliability of the underlying statistics. At a minimum, the denial of the request for an expert to assist the defense in combating the DNA prevented the defense from raising doubts about the strength of the prosecution's case. Accordingly, we conclude that the trial judge erred in denying Husske's motion for expert assistance. Pertinent to this conclusion, we note the court's statement in *Cauthron*, 846 P.2d at 514, that "our decision rests on the existence of the controversy, not on its resolution."

## IV.

In determining whether the trial judge erred in admitting into evidence statements that Husske made to a mental health counselor, other facts from the record become significant. The record established that four months after the victim was assaulted, and before an arrest was made, a police officer saw Husske standing near the rear of two apartments in the same apartment complex where the victim was sexually assaulted. The officer arrested Husske for furtively peeping into a dwelling in violation of Code § 18.2-130.

Two days after his arrest, Husske contacted the County of Henrico Area Mental Health and Retardation Services. An intake referral form contained notations that Husske was referred by an attorney, that Husske was depressed and suicidal, and that he sought treatment for conduct related to his "Peeping Tom" arrests. Husske was voluntarily admitted to a hospital psychiatric unit and given antidepressant medication.

Two weeks following his arrest, Husske pleaded guilty to two charges of furtively peeping into dwellings. During the trial, the trial judge was informed that Husske was being treated by the County's Mental Health Services. The judge sentenced Husske to twelve months in jail with twelve months suspended on each charge, conditioned upon his good behavior and five years of monitoring by the Community Diversion Incentive Program (CDI). *See* Code §§ 53.1-180 to 53.1-185.1. In the sentencing section of the warrant under "other," the trial judge wrote "Mental Health referral with report [Code §] 19.2-300." On that same date, the judge signed a referral form requiring CDI to "monitor mental health program." A CDI worker was appointed to monitor Husske's progress and to file an evaluation with the court. On November 8, a week after sentencing, Husske signed a release form authorizing the exchange of information between CDI and Mental Health Services.

Husske began meeting with Dr. Michael Elwood at Mental Health Services the day after he signed the release. Dr. Elwood confirmed to CDI that Husske was in treatment. Dr. Elwood stated that part of his treatment plan for Husske would be to identify whether problems in addition to voyeurism might have existed, and also said that part of effective therapy involves gradual disclosure of a person's thoughts, needs, history, acts, desires, and problems. In response to the question, "If Mr. Husske had refused to do what you recommended—the important things that you recommend to him—if he had refused to do those things, you would have advised C.D.I. of that refusal, as well?" Dr. Elwood responded affirmatively. Dr. Elwood testified that Mental Health Services was to notify CDI of Husske's progress in his treatment and would have informed CDI if Husske had refused to comply with the treatment plan.

Dr. Elwood began to include Husske's wife in the therapy sessions. In a session on December 28, Dr. Elwood screened Husske for "suicidality." He determined that Husske was at risk and arranged to have Husske again admitted to a hospital psychiatric unit. Dr. Elwood also testified that during this session, Husske's wife asked Husske to tell Dr. Elwood "some more of what's going on and what's troubling you." When Husske's wife moved to another part of the room, Dr. Elwood asked Husske, "What's she talking about?" After some hesitation, Husske responded that he

had attempted rapes and completed a rape.

Two weeks later, Husske was released from the hospital. During another session, Husske gave Dr. Elwood more details of the rape he had completed, including details of when and where he committed the rape, and how he accomplished the rape. Husske was visibly distressed when he spoke to Dr. Elwood. Dr. Elwood recommended that Husske be screened for admission into the sex offender's group conducted by Mental Health Services. Dr. Elwood also told Husske that the group was an important part of successful treatment. Dr. Elwood told Husske that the primary issue for the screening committee was Husske's "accountability" for the rape and attempted rapes. Husske expressed fear of legal consequences but provided details of the attempted rapes and the completed rape. Dr. Elwood stated that the leaders of the sexual offenders therapy group questioned Husske for details of the rape he committed and that Husske appeared distressed when he recounted them. On at least two occasions, Husske told the therapists that, although he would tell them the details of the assaults because he wanted to remain in his treatment plan, he did not want to face legal consequences. Husske related details that matched the rape incident reported to the police five months earlier by the victim.

In a report following the meeting with Husske, the screening committee stated that Husske was willing to consider ways to account for his crimes, but was not willing to put himself at risk in doing so. The screening committee rejected Husske as a participant in the program and recommended that Husske "be required to account for his crimes even if it causes him risk to himself." Following the committee report, Dr. Elwood told Husske that in order for his therapy to be successful, he would have to tell his CDI monitor the extent of his sexual offenses. Husske spoke to his CDI monitor but left out specifics of the crimes due to his fear of legal consequences. After Dr. Elwood told Husske's CDI monitor of Husske's admissions in therapy, CDI informed the police of Husske's statements concerning the rape.

Husske was arrested for the rape of the victim. At a pre-trial hearing, Husske moved that his statements to his therapists be excluded. The trial judge ruled that the statements were admissible.

## V.

█ The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."

> The essence of this basic constitutional principle is "the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." . . . [T]he Fifth Amendment prevents a criminal defendant from being made " 'the deluded instrument of his own conviction.' "

*Estelle*, 451 U.S. at 462 (citations omitted). Simply put, a person is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964).

█ "The general rule that the [Fifth Amendment] privilege must be claimed when self-incrimination is threatened has . . . been deemed inapplicable in cases where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and . . . compe[l] . . . incriminating testimony.' " *Minnesota v. Murphy*, 465 U.S. 420, 434 (1984) (quoting *Garner v. United States*, 424 U.S. 648, 661 (1976)). The State may not compel an individual to make incriminating disclosures in violation of the Fifth Amendment privilege upon the threat of imposing other sanctions "capable of forcing the self-incrimination which the Amendment forbids." *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977).

█ In *Cunningham*, the Supreme Court struck down as an impermissible abridgment of the privilege against self-incrimination a scheme that disqualified a public official from holding office if the official refused to waive the privilege against self-incrimination when testifying before a grand jury. The Court stated that "when a State compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment and cannot be used against the declarant in a subsequent criminal prosecution." *Id.* at 805. The Court reaffirmed an earlier holding "that statements given under such circumstances were made involunta-

rily and could not be used to convict the officers of crime." *Id.*

Husske argues that the record established that he revealed his participation in the crimes as a part of his participation in the mental health services treatment program. He asserts that the statements were made because he was obliged to relate his criminal activity to his therapists in order to comply with the court order. Had he failed to comply with the court order, he argues, he would have been at risk of having his suspended sentence revoked, which could in turn result in serving the two jail sentences. The Commonwealth responds that Husske's treatment program was not "court-ordered." The Commonwealth also argues that an untimely filed transcript is indispensable to the resolution of this issue and that therefore the issue is not properly before us.

The untimely transcript was of a session at which no evidence was taken. The trial judge merely rendered a ruling based on evidence taken at an earlier evidentiary hearing. After reviewing the record in this case and the issue in question, we conclude that the transcript is not indispensable to our resolution of this case and therefore address Husske's argument on its merits. *See* Rule 5A:8; *Turner v. Commonwealth*, 2 Va. App. 96, 99, 341 S.E.2d 400, 402 (1986).

Although Husske voluntarily made the initial contact with mental health services, it is clear from this record that after the sentencing order was entered, Husske's participation in the treatment program was mandated by the court order. The sentencing order clearly stated that a condition of Husske's suspended sentence was participation in CDI. In addition, the sentencing order explicitly mandated "mental health reference with report [Code §] 19.2-300." If there was any doubt that the two were linked, it is dispelled by the judge's signature on the CDI referral form requiring CDI "to monitor mental health program."

Furthermore, the Commonwealth's conduct in the general district court belies its suggestion in this Court that Husske's treatment was not ordered by the general district court judge. *See Kelly v. Commonwealth*, 8 Va. App. 359, 365-67, 382 S.E.2d 270, 274 (1989) (the Commonwealth is bound by concessions made at trial). When Husske was terminated from the mental health services program, the Commonwealth determined that Husske had violated the terms of the sentencing order and sought to have the

sentencing judge revoke Husske's suspended sentence. In pertinent part, the show cause order that the judge entered stated the following:

> This day came the Attorney for the Commonwealth and represented to the Court that in this Court on October 30, 1990, the defendant, Paul J. Husske, was found guilty of in the nighttime, secretly peeping into the window of an occupied dwelling located at 2323 Mainmast Ct. in the aforesaid county, and the Court assessed him the costs of Court; sentenced him to twelve (12) months in jail, execution of which was suspended conditioned upon him being of good behavior and keeping the peace for five (5) years and *that he participate in mental health treatment, with his participation monitored by CDI.*
>
> And it being further represented to the Court that the defendant, Paul J. Husske, has failed to comply with the Order of this Court in that he was recently terminated unsuccessfully from treatment due to his admission of having committed more serious offenses. Mr. Husske is currently committed to Central State Hospital as a result of a suicidal attempt.

(emphasis added). The record reflects that at the show cause hearing, the judge did not revoke the suspended sentence but, instead, struck the word, "dismissed," and marked on the sentencing portion of the order the word, "completed." The facts in this record indisputably prove that Husske's participation in the mental health services program was ordered as a condition of his suspended sentence. Husske made the incriminating admissions after the court order suspending his sentence was entered.

Dr. Elwood testified that honesty, candor, and trust were significant components of the treatment plan, and he testified that if he had thought Husske was not participating in the important parts of his treatment, he would have reported that fact to CDI. Moreover, Dr. Elwood also told Husske that his treatment program required that he tell the CDI worker of his crimes. Husske's reluctance to confess is manifest in his repeated assertion that he did not want to become legally accountable for his crimes. While Husske's wife may have urged him to confide in his doctors, the fact remains that Husske made the disclosure as a function of his treatment program.

Requiring Husske to choose between confessing his crimes (and thereby complying with the requirement of candor in the mental health services treatment) or not cooperating in the treatment program (and thereby suffering revocation of his sentence and serving time in jail) made his statements involuntary. At trial, the Commonwealth used statements made by Husske in the context of court-ordered counseling. The statements were made because Husske was obliged to relate his criminal activity to his therapists in order to comply with the court order. Had he failed to comply with the court order, he would have been at risk of having his suspended sentence revoked, which would in turn have resulted in the imposition of a twenty-four month jail sentence.

Requiring Husske to choose either confessing his crimes (and thereby complying with the court order) or serving time in jail is as coercive as forcing a public official to choose either waiving his privilege against self-incrimination or suffering a diminished reputation in the community because of losing a political position. *Cunningham*, 431 U.S. at 807. *See also Garrity v. New Jersey*, 385 U.S. 493 (1967) (holding that forcing police officers to forfeit their employment or answer incriminating questions made the officers' answers involuntary); *Pens v. Bail*, 902 F.2d 1464 (9th Cir. 1989) (holding unconstitutional a sentence based on incriminating statements made during court-ordered therapy). In cases of this type the touchstone is whether coercion was present. *Cunningham*, 431 U.S. at 806-07; *Garrity*, 385 U.S. at 497-99; *Pens*, 902 F.2d at 1465-66.

Husske expressed an unwillingness to expose himself to criminal accountability. He was privileged not to comply with the mental health services treatment only if the court would not have revoked his sentence. However, the record demonstrates that if he had failed to cooperate he would have been subject to incarceration. The hazard posed by the failure to cooperate was real. Dr. Elwood testified that he would have informed the CDI if Husske had failed to cooperate in the program. Moreover, the risk that the Commonwealth would seek a revocation of the suspended sentence was not theoretical. Indeed, the Commonwealth sought to revoke the sentence when Husske was terminated from the program after he made his disclosures. Husske's disclosures under these circumstances were compelled within the meaning of the Fifth Amendment.

The Commonwealth argues, however, that the United States Supreme Court has decided in *Murphy* that the privilege against self-incrimination does not apply in a situation closely analogous to Husske's. We disagree. Although Murphy, as did Husske, made incriminating statements, the similarities between the two cases end there. Significantly, Murphy's suspended sentence was conditioned upon his truthfully answering questions "about matters relevant to his probationary status." *Id.* at 436. The Supreme Court specifically held that Minnesota did not require Murphy "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." *Id.*

In contrast, Husske's participation in mental health treatment was not optional for him, nor could it be accomplished if he failed to respond with "[c]andor, sincerity, and trust" about the extent of his sexual conduct. Although Murphy apparently could have complied with his probation by refusing to answer incriminating questions, *id.* at 437, such a refusal on Husske's part would have been inconsistent with his treatment plan, participation in which was a condition of his suspended sentence. The Court in *Murphy* clearly contemplated that the circumstance that Husske faced might happen and spoke to it in unambiguous terms:

A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. *The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution.* There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

*Murphy*, 465 U.S. at 435 (emphasis added) (footnote omitted).

Husske repeatedly asserted that he was afraid of the legal consequences of making incriminating statements. His therapists responded that making those very statements was important to his

treatment which was a condition of his suspended sentence. Husske was therefore faced with the "classic penalty situation" contemplated by *Murphy. Id.*

Finally, the Commonwealth points to *Colorado v. Connelly*, 479 U.S. 157 (1986), as dispositive of Husske's claim. That case is readily distinguishable on its facts. In *Connelly*, the defendant approached a police officer and stated that "he had murdered someone and wanted to talk about it." *Id.* at 160. The police officer informed Connelly of his right to remain silent, that anything he said could be used against him in court, and that he had a right to an attorney prior to any police questioning. *Id.* at 160-61. That notwithstanding, Connelly volunteered detailed and incriminating information. *Id.* at 161. Husske, in contrast, was clearly uncomfortable with revealing his crimes. He was informed that his disclosures were required and was not given the option of refusing the disclosure. Despite the coercion, his discomfort was manifest when he deliberately left out some details of the crime in relating his story to the CDI worker. The voluntariness manifest in *Connelly* simply is not present here.

## VI.

For the foregoing reasons, we reverse the convictions. We hold that Husske is entitled on remand to a court-appointed expert in DNA to assist with his defense and that the incriminating statements he made as part of his court-ordered treatment plan must be excluded from evidence.

*Reversed and remanded.*

Koontz, J., concurred.

Willis, J., concurring in part and dissenting in part.

I agree that the trial court erred in refusing to provide a DNA expert to assist in Husske's defense, but I disagree with the majority's rationale in reaching that conclusion. I also disagree with the majority's holding that Husske's statements to mental health personnel were coerced and that their receipt into evidence violated the Fifth Amendment.

## PROVISION OF A DNA EXPERT

In constructing a due process rationale for requiring the provision of a DNA expert to assist Husske, the majority relies upon scientific treatises and reports that are not in evidence. Husske proffered to the trial court numerous scientific documents, all of which the trial court rejected. Those rulings are not challenged on appeal. The NRC Report, upon which the majority relies heavily, was not even among the proffered documents. The competence and credibility of these documents have not been established. Upon this infirm foundation, the majority bases its recital and discussion of controversies surrounding DNA analysis. No evidence in the record supports those recitals and conclusions. In my view, this practice is unsound.

The majority relies upon *Ake v. Oklahoma*, 470 U.S. 68 (1985). *Ake* addressed the constitutional necessity of providing psychiatric assistance to an accused who interposed an insanity defense. Addressing the application of *Ake* to the provision of non-psychiatric assistance and setting forth the general rule governing the provision of expert assistance to criminal defendants, our Supreme Court said:

> [The defendant] claims he was entitled to an *ex parte* hearing on the necessity of the Commonwealth's funding of experts to assist him in his defense. [He] admits none of the proposed experts would address the question of his sanity, as in *Ake v. Oklahoma*, 470 U.S. 68 (1985); they were all forensic scientists. [He] had no constitutional right requiring the Commonwealth to provide funding of this type of expert assistance.

* * * * * * *

> We find no logical or constitutional reason for adopting a *per se* rule requiring the Commonwealth to furnish an indigent defendant with a number of experts equal to the number the prosecution may call. If the Commonwealth provided [the defendant] with the "basic tools of an adequate defense," it complied with the constitutional requirements. The Commonwealth need not supply [the defendant] with all services that may be available.

* * * * * * *

> The trial court had the discretion to decide whether [the defendant] needed an expert or experts, and the burden is on [the defendant] to show that this discretion was abused.

*O'Dell v. Commonwealth*, 234 Va. 672, 686-87, 364 S.E.2d 491, 499, *cert. denied*, 488 U.S. 871 (1988) (citations omitted).

DNA analysis played an important part in Husske's identification as the perpetrator of the crimes. The means of challenging that identification constituted a "basic tool of an adequate defense." Defense counsel explained to the trial court his inability, and the inability of any person not trained in the field, to mount such a challenge. The trial court did not disagree with that assertion. It replied, "I don't feel I have the authority to do that. The motion is denied." The trial court then went on to ask the Commonwealth's attorney, "Well, you are using Consolidated Laboratories? . . . I just wanted to know if you were using Consolidated Lab, because I . . . I think that if you were not, I could order Consolidated Lab to assist, but that's as far as I could go."

The trial court apparently believed that it lacked authority to authorize the employment of expert assistance for the defense. That is not the case. Code § 19.2-163 provides, in pertinent part:

> The circuit or district court shall direct payment of such reasonable expenses incurred by such court-appointed attorney as it deems appropriate under the circumstances of the case.

*See also Singleton v. Commonwealth*, 16 Va. App. 841, 433 S.E.2d 507 (1993).

I would hold that the trial court erred in ruling that it lacked authority to provide expert DNA assistance to Husske. The court should have authorized Husske's attorney to investigate the availability of such assistance, to report its availability and cost to the court, and to seek a reasonable allowance.

## HUSSKE'S STATEMENTS

On October 28, 1991, the trial court conducted a hearing at which it made findings of fact supporting its ruling that statements made by Husske to personnel of the Henrico County Mental Health and Mental Retardation Department would be received into evidence. A transcript of that hearing was not properly

filed, and those findings of fact are not before us on appeal. Thus, the issue on appeal is whether the record contains credible evidence supporting the trial court's decision to admit those statements. I find that it does.

Husske was referred to the Mental Health Department by his attorney. He voluntarily undertook a course of therapy addressing his misconduct as a "Peeping Tom." When he came to trial on the "Peeping Tom" charges, his attorney advised the trial court that Husske was in therapy. The trial court imposed a suspended sentence conditioned, *inter alia*, on the continuation of therapy and a report pursuant to Code § 19.2-300. At his wife's insistence, Husske admitted to his therapist his commission of the crimes involved in this case. The therapist did not force him to talk or threaten him in any way. Specifically, the therapist did not threaten Husske with punishment. After his confession, Husske executed a release authorizing the therapist to report the revealed information to the CDI coordinator. At no time did Husske decline to talk to any person involved. At no time did he interpose his right against self-incrimination. These facts, all of which are contained in the record, support a finding that Husske's confessions to the mental health personnel were not coerced and support the trial court's ruling that those confessions were admissible into evidence.